**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GINGER WASHINGTON,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES LLC,<br><br>　　　　　　　Defendant. | **Case No.:**<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>FCRA, 15 U.S.C. §§ 1681 *et seq.* |

Plaintiff GINGER WASHINGTON ("Plaintiff"), by and through her undersigned attorney, alleges the following against Defendant EQUIFAX INFORMATION SERVICES LLC ("Equifax"):

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs and attorneys' fees brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §§ 1681a–x and for the common-law tort of defamation.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. The Act likewise demands that consumers' disputes of inaccurate information be taken seriously by industry players, requiring that they do much more than simply pass information between themselves electronically without actually investigating the substance of a consumer's dispute and consider all information available in conducting such investigations.

4. The FCRA demands of reporting agencies like Equifax, utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

5. Also, when a consumer disputes the accuracy of information with the agencies, they must transmit that dispute to the entity who furnished the information. The furnisher must then conduct its own, independent investigation of the dispute. Id. § 1681s-2(b).

6. Plaintiff brings claims under Section 1681e(b) against Equifax, because they reported about Plaintiff inaccurate information regarding several accounts. When Plaintiff disputed the inaccuracies, Equifax did not reasonably investigate, also violating Section 1681i.

7. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax has complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax has been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

## JURISDICTION

8.  The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. § 1367.

9.  Venue is proper in this District per 28 U.S.C. § 1391, as the acts, omissions and transactions that give rise to this action occurred, in substantial part, in this District.

10. Venue is also proper in this district because Plaintiff lives in this District, Defendant conduct business in this District, and the injury occurred in this District.

## PARTIES

11. Plaintiff is a natural person residing in Queens County, New York. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c).

12. Defendant Equifax Information Services LLC is headquartered in Georgia and does business in the State of New York through its registered agent located in Albany, New York.

13. Equifax is a "credit reporting agency," as defined under 15 U.S.C. 1681a(f) and it disburses consumer reports to third parties for monetary compensation.

14. Equifax acted through its agents, employees, officers, members, directors, heirs, predecessors, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## GENERAL FACTUAL ALLEGATIONS

### Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of Equifax's Creditor-Customers

15. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970)

(statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 414–15 (4th Cir. 2001)."In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

16. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

17. Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through her dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]15 U.S.C. § 1681i(a)(1)(A).

18. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic

examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

19. It has long been the law that a CRA, such as Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the disputed item. *See, e.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

20. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).

21. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry"). 357 3d 426, 430 (4th Cir. 2004).

22. Further, as Equifax is aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Equifax has a duty to conduct

a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that

this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance. *Burke*, 2011 WL 1085874, at *4.

23. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent. Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

24. Today, furnishers and other of Equifax's furnishers have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. But while Equifax's duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

*Plaintiff Discovers Equifax Was Inaccurately Reporting Several Accounts*

25. Sometime prior to the commencement of this action, Plaintiff reviewed her personal credit file maintained by Equifax.

26. Within the Equifax report, Plaintiff discovered that Equifax was furnishing inaccurate and incomplete information about a few accounts Plaintiff owned, namely Merrick Bank ("Merrick"), Capital One Bank USA NA ("Capital One"), Nordstrom/ TD Bank ("TD Bank") and Kohls/Capital One ("Kohls").

27. Within the Equifax report, the Merrick account ending in 6728 was reported inaccurately. Specifically, the fields for "Actual Payment," "Available Credit", "Balance"," Credit Limit", "Amount Past Due", "Actual Payment Amount," "Date of Last Payment", "Creditor Classification", and "Date Closed" were not only inaccurate and incomplete but also inconsistent with other reported data, further compounding the errors. Equifax's failure and neglect to accurately and completely report the history of the Merrick Account was a blatant suppression of the Plaintiff's credit scores, profiles, and ability to benefit from credit.

28. Within the Equifax report, the Capital One account ending in 9948 was reported inaccurately. Specifically, the fields for "Actual Payment," "Available Credit", Credit Limit"," Amount Past Due", "Actual Payment Amount,", "Creditor Classification", and "Date Closed" were not only inaccurate and incomplete but also inconsistent with other reported data, further compounding the errors. Equifax's failure and neglect to accurately and completely report the history of the Capital Account was a blatant suppression of the Plaintiff's credit scores, profiles, and ability to benefit from credit.

29. Within the Equifax report, the TD Bank account ending in 2320 was reported

inaccurately. Specifically, the fields for "Actual Payment," "Available Credit", Credit Limit," Amount Past Due", "Actual Payment Amount,", "Actual Payment Amount" "Creditor Classification," "Date Closed, and "Payment History" (January 2018-June 2020) were not only inaccurate and incomplete but also inconsistent with other reported data, further compounding the errors. Equifax's failure and neglect to accurately and completely report the history of the TD Account was a blatant suppression of the Plaintiff's credit scores, profiles, and ability to benefit from credit.

30. Within the Equifax report, the Kohls account ending in 8088 was reported inaccurately. Specifically, the fields for "Available Credit", "Actual Payment", Credit Limit" were not only inaccurate and incomplete but also inconsistent with other reported data, further compounding the errors. Equifax's failure and neglect to accurately and completely report the Kohls Account was a blatant suppression of the Plaintiff's credit scores, profiles, and ability to benefit from credit.

### *Plaintiff Disputes the Inaccuracies with Equifax*

31. On or around December 16, 2024, Plaintiff sent a dispute letter to Equifax requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Merrick, Capital One, TD Bank, and Kohls on her credit file.

32. Equifax received the dispute letter on or about December 26, 2024.

33. Within her dispute sent to Equifax, Plaintiff included the credit report pages, clearly marking the Merrick, Capital One, TD Bank, and Kohls accounts, highlighting the missing, incomplete, inaccurate, and contradictory information.

34. The information furnished by Merrick, Capital One, TD Bank, and Kohls to Equifax was at all times inaccurate and incomplete.

35. On or about a date better known to Equifax and Merrick, Equifax furnished Plaintiff's dispute to Merrick using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Equifax. e-Oscar is also the system by which Merrick has agreed they will accept such consumer disputes from Equifax.

36. Under such circumstances, Merrick became obligated under the FCRA to investigate Plaintiff's dispute.

37. On or about a date better known to Equifax and Capital One, Equifax furnished Plaintiff's dispute to Capital One using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Equifax. e-Oscar is also the system by which Capital One has agreed they will accept such consumer disputes from Equifax.

38. Under such circumstances, Capital One became obligated under the FCRA to investigate Plaintiff's dispute.

39. On or about a date better known to Equifax and TD Bank, Equifax furnished Plaintiff's dispute to TD Bank using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Equifax. e-Oscar is also the system by which TD Bank has agreed they will accept such consumer disputes from Equifax.

40. Under such circumstances, TD Bank became obligated under the FCRA to investigate Plaintiff's dispute.

41. On or about a date better known to Equifax and Kohls, Equifax furnished Plaintiff's dispute to Kohls using an electronic system called "e-Oscar," which is an industry-wide

process by which such disputes are electronically communicated to furnishers and dispute results back to Equifax. e-Oscar is also the system by which Kohls has agreed they will accept such consumer disputes from Equifax.

42. Under such circumstances, Kohls became obligated under the FCRA to investigate Plaintiff's dispute.

43. Equifax has refused to invest time, money, and effort to carry out its federally mandated duties to conduct a reinvestigation.

44. As a result, inaccurate, unverifiable, and/or incomplete accounts remain on Plaintiff's credit report.

45. At the date of this filing, Equifax has failed to conduct a reasonable investigation into Plaintiff's dispute.

### Equifax Did Not And Do Not
### Conduct Any Investigation Of Most Consumer Disputes

46. Unknown to the Plaintiff until this lawsuit, it has long been the practice of Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax uses the vendor, previously known as Intelenet Global Services and now as Teleperformace.

47. Equifax's dispute processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

48. In fact, Equifax strongly encourages consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available

dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax. It gets sent to Defendant's creditor customer for its sole review and consideration.

49. Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes.

50. Equifax then forwarded the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

51. Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

52. Equifax has taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax

hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

53. Regardless of whether or not these statements are correct, Equifax believes that they cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

54. Equifax did not conduct any reinvestigation of Plaintiff's dispute. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

55. Equifax has continued to report inaccurate information about the accounts, despite being notified of the inaccuracies.

56. As a result of the inaccurate and incomplete credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a. Stress associated with multiple denials for personal loans, credit cards, and delays in applying for future lines of credit;

   b. Monies lost by attempting to fix her credit, e.g. communication costs, postage for disputes;

   c. Loss of time attempting to cure the errors;

   d. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

e. Stress associated with of hours attempting to resolve this matter.

### *Equifax's Conduct Was Willful*

57. The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

58. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418;  *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

59. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The Equifax's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Equifax's "grave responsibilities" to ensure accuracy has not changed.

60. Equifax has received many thousands of disputes and other complaints regarding the creditors at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

61. Just in federal court alone, during the last decade, the creditor-furnishers disputed by Plaintiff has had to defend collectively over 1,000 consumer lawsuits.

62. In many or even most of these FCRA lawsuits brought by a consumer, one or more of the Equifax was a named co-Defendant.

63. Equifax knew or should have known of this litigation history.  It uses and has access to PACER to investigate and monitor such consumer complaints.

64. The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to Equifax, and/or to other government agencies, attorneys, or non-profit organizations.

65. Equifax regularly receives unredacted consumer dispute details from this database.

66. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

67. Further, over 35,000 of the CFPB complaints against Equifax, were based largely on their failure to reasonably investigate consumer disputes.

68. Just in the last 12 months alone, Equifax has been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Equifax violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

69. While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Equifax on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the Defendant on notice that it may not merely "parrot" what its creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

70. Equifax has had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x

896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of Plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985). *Sampson v. Equifax Info. Servs., LLC,* No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

71. Defendant has also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

72. In 2015, a large group of state Attorneys General forced a consent order from the CRAs by which they were required to develop procedures necessary to comply with the FCRA.[2]  The AG Settlement required amongst many changes and mandates that Equifax comply with § 1681i(a).

73. The AG Settlement also required the CRAs to conduct significant research and data gathering – even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, Equifax did not meaningfully comply with the AG Settlement in these regards.

74. Equifax is also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Equifax when a consumer makes a dispute.  That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

75.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued
> Automated Injustice: How a Mechanized Dispute System Frustrates
> Consumers Seeking to Fix Errors in their Credit Reports, the

---

[2]    Available        at        https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[3] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

76.    Among many of the Equifax's accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

77. Despite the notice and judicial, regulatory, and public interest criticism, Equifax have refused to change its dispute investigation process because it would cost too much money to do so.

78. Equifax's procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT 1: AGAINST EQUIFAX
### Violation of § 1681e(b) of the FCRA

79. The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

80. Defendant Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

81. As a result of this conduct, action, and inaction of Equifax, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why she lost the ability to benefit from credit.

82. Further, after the Plaintiff's detailed dispute put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

83. Equifax furnished multiple consumer reports to third parties containing the inaccurate and incomplete information and Equifax did so after receiving notice of these inaccuracies.

84. Equifax 's conduct, action, and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

85. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

86. The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT 2: AGAINST EQUIFAX**
**Violation of § 1681i of the FCRA**

87. The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

88. In preparing the Plaintiff's credit files, Equifax did not investigate Plaintiff's claims and instead relied upon verification from a source or sources they have reason to know is unreliable.

89. Further, Equifax violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of her disputes, that party—the consumer reporting agency who received the disputes—must investigate those disputes. The statute does not contemplate someone other than Equifax conducting the investigation.

90. Yet, Equifax used an unrelated third-party, Intelenet, over which Equifax has control to conduct its investigations. Intelenet is not, in the words of the statute, "the [consumer

reporting] agency" to whom Plaintiff disputed. Equifax therefore violated 1681i on this basis because they sent Plaintiff's dispute away to a company that was not their controlled agent rather than investigating them as required.

91. As a result of Equifax's violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

92. Equifax's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

93. The Plaintiff is entitled to recover costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

94. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment be entered against Defendant for the following:

A. Declaratory judgment that Defendant violated the FCRA;

B. Actual damages pursuant to 15 U.S.C. §1681n(a);

C. Statutory damages pursuant to 15 U.S.C. §1681n(a)(1)(A);

D. Punitive damages pursuant to 15 U.S.C. §1681n(a)(2);

E. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§1681n(c) and

1681o(b);

F.  Awarding Plaintiff any pre-judgment and post-judgment interest as may be allowed under the law;

G.  Specific performance and injunctive relief; and

H.  Any relief that this arbitration forum deems appropriate.

Dated: March 5, 2025
      New York, New York

**LAW OFFICE OF ABEL L. PIERRE, ATTORNEY-AT-LAW, P.C.**

Attorney I.D.#AP-5508
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 766-3323
Facsimile: (212) 766-3322
abel@apierrelaw.com

*Attorneys for Plaintiff*